<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PRINCETON NEUROLOGICAL SURGERY, P.C., <br><br> Plaintiff, <br><br> v. <br><br> AETNA, INC. and AETNA LIFE INSURANCE COMPANY, <br><br> Defendants. | Civil Action No. 22-01414 (GC) (DEA) <br><br> <u>**MEMORANDUM OPINION**</u> |

<u>**CASTNER, U.S.D.J.**</u>

**THIS MATTER** comes before the Court upon the Motion to Dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) filed by Defendants Aetna, Inc., and Aetna Life Insurance Company (together, "Aetna"). (ECF No. 27.) Plaintiff Princeton Neurological Surgery, P.C., opposed, and Aetna replied. (ECF Nos. 31 & 36.) The Court has carefully considered the parties' submissions and decides the matter following oral argument on January 4, 2024. For the reasons set forth below, and other good cause shown, Aetna's motion is **GRANTED**.

**I.     BACKGROUND**

This dispute centers around common law causes of action brought by an out-of-network healthcare provider, Princeton Neurological, seeking to be reimbursed by a health insurer, Aetna, for a spinal surgical procedure that was performed on a patient, J.R., insured under a welfare

benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA").[1]

A.  FACTUAL BACKGROUND[2]

Princeton Neurological's owner, John D. Lipani, M.D., is a non-participating, out-of-network provider with Aetna.  (ECF No. 25 ¶ 2.)  Before Dr. Lipani accepted J.R. as a patient, Princeton Neurological's billing coordinator, Kathy Bonner, R.N., called Aetna on April 26, 2021, "on behalf of 'J.R.'"  (*Id.* ¶ 6.)  The call was allegedly intended to learn how Aetna, "in its capacity as the claim administrator for a self-funded health benefit plan sponsored by NECA Local 313 IBEW," "would price claims submitted to it for [out-of-network] services rendered" to J.R. by Dr. Lipani.  (*Id.* ¶ 1.)

During the call,[3] "an Aetna Provider Services representative named Yvette J. . . . provided . . . guidance on the rate of payment under J.R.'s [ERISA-governed] plan for services rendered by an out-of-network provider such as Dr. Lipani.  This included information on per-visit co-payments, an annual deductible, an annual out-of-pocket maximum, and confirmation that no referral from a primary care provider was required for Dr. Lipani to evaluate J.R."  (*Id.* ¶¶ 6, 21.) "Yvette J. represented to Ms. Bonner that the out-of-network payment methodology applicable to J.R.'s plan, the Local 313 plan, was '100% of Fair Health.'"  (*Id.* ¶¶ 6, 22.)  Based on the call, "Dr. Lipani agreed to take J.R. on as a patient."  (*Id.* ¶¶ 7, 24.)

Upon examining J.R., Dr. Lipani "recommended surgery as being the most medically appropriate plan of care."  (*Id.* ¶ 25.)  Princeton Neurological then "submitted the appropriate

---

[1]      The Court incorporates its earlier decision, found at *Princeton Neurological Surgery, P.C. v. Aetna, Inc.*, Civ. No. 22-01414, 2023 WL 2307425 (D.N.J. Feb. 28, 2023).  (ECF No. 23.)

[2]      On motions to dismiss pursuant to Rule 12(b)(6), courts accept as true all well-pleaded facts in the complaint.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[3]      According to the transcripts provided by Aetna, it appears that Ms. Bonner placed two back-to-back calls to Aetna.  (ECF No. 27-4 at 4-25.)

paperwork for Aetna to authorize the proposed surgery." (*Id.* ¶ 31.)  On May 7, 2021, Aetna approved the proposed surgery via a pre-authorization letter.[4]  (*Id.*)

After Dr. Lipani performed J.R.'s spinal surgery on May 14, 2021, Princeton Neurological was reimbursed at 400% of Medicare, which was about $300,000.00 less than what Princeton Neurological expected to be paid under the plan.  (*Id.* ¶¶ 7, 32.)  Princeton Neurological sues to compel Aetna to pay the "claim for J.R.'s services according to 100% of Fair Health."  (*Id.* ¶ 59.)

## B.  PROCEDURAL BACKGROUND

On February 28, 2023, the Court issued a Memorandum Opinion and Order dismissing without prejudice the common law claims in Princeton Neurological's Amended Complaint as expressly preempted by section 514(a) of ERISA.  (ECF No. 23 & 24.)  On March 30, 2023, Princeton Neurological filed the Second Amended Complaint.[5]  (ECF No. 25.)  In the SAC, Princeton Neurological has eliminated its *quantum meruit* claim and now asserts the following five causes of action against Aetna: Count One, Breach of Contract; Count Two, Breach of the Warranty of Good Faith and Fair Dealing; Count Three, Promissory Estoppel; Count Four, Intentional Misrepresentation; and Count Five, Negligent Misrepresentation.  (*Id.* ¶¶ 60-93.)

On April 27, 2023, Aetna moved to dismiss the SAC, arguing that the claims are expressly preempted by ERISA and, even if not preempted, fail to state a claim upon which relief can be

---

[4]    The pre-authorization letter states that the approved services were "subject to the requirements in th[e] letter" and that services may not be paid pursuant to certain conditions of J.R.'s ERISA-governed plan.  (ECF No. 27-3 at 33-35, 41-47 ("Authorization for this service has been approved, subject to the requirements in this letter. . . . This authorization approval is NOT effective and benefits may not be paid if: . . . the member is no longer covered at the time the approved treatment/services are actually performed . . . [,] the member has exceeded any applicable benefit maximums under the plan . . . [,] the member's plan no longer includes coverage for the approved treatment/services. . . .  Members should refer to their plan administrator to determine exclusions and limitations under the plan.").)

[5]    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332.

granted.  (ECF No. 27.)  Princeton Neurological opposed, and Aetna replied.[6]  (ECF Nos. 31 &

36.)  Oral argument was held on January 4, 2024.  (ECF No. 42.)

## II.     LEGAL STANDARD

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts

"accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of

the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts

to state a claim to relief that is plausible on its face.'"  *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131,

140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406,

412 (3d Cir. 2020)).  "A claim is facially plausible 'when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.'"  *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau*

*of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).  When assessing the factual allegations in a

complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that

are supported only by mere conclusory statements."  *Wilson*, 57 F.4th at 140 (citing *Oakwood*

*Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).  The defendant bringing a Rule 12(b)(6)

motion bears the burden of "showing that a complaint fails to state a claim."  *In re Plavix Mktg.,*

*Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells*

*Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III.    DISCUSSION

### A.  ERISA EXPRESS PREEMPTION

"ERISA is a 'comprehensive legislative scheme' designed to 'protect . . . the interests of

participants in employee benefit plans and their beneficiaries,' and to do so provides for a variety

---

[6]     After briefing was complete, the parties submitted correspondence related to supplemental
authority.  (ECF Nos. 40-41 & 43-44.)

of standards and regulations for . . . 'welfare plans.'" *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 449 (3d Cir. 2018) (first quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004); then quoting 29 U.S.C. § 1002(1)).  These welfare plans "include[] health insurance plans, and ERISA provides employees covered by such plans with the right to sue" when necessary to obtain promised benefits.  *Id.* (citations omitted).

A critical component to the ERISA scheme is section 514(a)—"a broad express preemption provision"—that says that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 226 (3d Cir. 2020) (quoting 29 U.S.C. § 1144(a)).  Congress aimed "to make clear that ERISA's mandates supplanted the patchwork of state law previously in place and to ensure that plans were not crippled by the administrative cost of complying with not only ERISA, but also innumerable, potentially conflicting state laws." *Id.*

Recognizing, however, that without any limiting principles the preemption provision could be stretched too far, the United States Supreme Court "has sought to craft a functional test for express preemption, instructing that a state law 'relates to' an employee benefit plan if it has either (1) a 'reference to' or (2) a 'connection with' that plan." *Id.* (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983)).  "The first applies '[w]here a State's law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation.'  The second covers state laws that 'govern[] . . . a central matter of plan administration or interfere[] with nationally uniform plan administration,' and those state laws that have 'acute, albeit indirect, economic effects [that] force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers.'" *Id.* (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016)).

To determine if a state law cause of action makes "impermissible 'reference to' ERISA plans," the Third Circuit Court of Appeals has "distill[ed] two overlapping categories of claims 'premised on' ERISA plans: (a) claims predicated on the plan or plan administration, *e.g.*, claims for benefits due under a plan, or where the plan 'is a critical factor in establishing liability'; and (b) claims that 'involve construction of [the] plan[],' or 'require interpreting the plan's terms.'" *Id.* at 230 (citations omitted).  To determine if a state law cause of action has a "connection with" an ERISA plan, the analysis "focus[es] primarily on whether claims (a) 'directly affect the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries'; (b) interfere with plan administration; or (c) undercut ERISA's stated purpose." *Id.* at 235 (citations omitted).

In *Plastic Surgery Center v. Aetna*, the Third Circuit considered the specific circumstances under which section 514(a) expressly "preempt[s] an out-of-network provider from pursuing common law breach of contract, promissory estoppel, and unjust enrichment claims." *Id.* at 223. There, two patients needed medical procedures, and before agreeing to perform the procedures, the out-of-network provider contacted Aetna to confirm that it would make the payment. *Id.* at 223-24.  For the patient whose plan provided out-of-network benefits in emergencies, Aetna "contracted . . . to pay . . . a reasonable amount . . . according to the terms of the Plan." *Id.* at 224. For the other patient, whose plan did not provide out-of-network benefits, Aetna agreed "to provide payment at the 'highest in[-]network level.'" *Id.*  After the procedures were performed, "Aetna allegedly refused to live up to its end of the bargain" and paid a fraction of what was billed. *Id.*

Under those circumstances, the Third Circuit found that the out-of-network provider's common law claims were not expressly preempted: the claims "arose precisely because there was no coverage under the plans for services performed by an out-of-network provider" and, instead, there was an alleged separate agreement that the provider had worked out with Aetna. *Id.* at 231.

The Court found that this separate agreement was adequately pleaded where "the parties agreed that the [out-of-network provider] would perform the surgeries and related medical care in exchange for payment from Aetna of a 'reasonable amount' under [the first patient's] plan and at the 'highest in[-]network level' under [the second patient's] plan for all component services (not merely those services covered under the terms of the plan)." *Id.* at 231-32.  The Court was not "suggest[ing] that out-of-network providers are categorically exempt from section 514(a), with carte blanche to file suit for services rendered to plan participants." *Id.* at 232 n.16.  Rather, "[w]hether any agreement was reached with a provider, and the extent to which the terms of that agreement are so intertwined with the plan as to 'relate to' an ERISA plan, are questions that depend on the facts and circumstances of the given case." *Id.* (citation omitted).

In its February 2023 Memorandum Opinion, this Court determined that Princeton Neurological's common law claims are expressly preempted by ERISA § 514(a). (ECF No. 23 at 7-15.)   The Court found that neither the April 26, 2021 pre-admission calls between the representatives of Aetna and Princeton Neurological nor the May 7, 2021 pre-authorization letter included "any specific representations or express promises to pay Plaintiff that were independent of the terms of J.R.'s Plan." (*Id.* at 10.)

As to the pre-admission calls, the Court explained that there were "no allegations of oral promises to pay a certain amount . . . for surgical services." (*Id.* at 10.)  The Court wrote:

> In fact, no surgical services . . . [were] discussed . . . [and] Plaintiff told Aetna on the telephone call that the types of services it was asking about was 'initially, a special office visit and *then perhaps spine surgery if he needs it*.'  As such, Aetna's representations as to out-of-network benefits under J.R.'s Plan related primarily to payment for the initial medical office visit.  Such representations providing information about the terms of J.R.'s Plan cannot be found to be independent or separate from J.R.'s Plan.  Nor can such representations support any allegations that Aetna agreed to pay for surgical services for J.R. when no such surgical services were mentioned or even contemplated at the time.

[(*Id.* at 10-11 (emphasis in original) (citations omitted).)]

As to the pre-authorization letter, the Court explained that the letter "was issued pursuant to J.R.'s Plan and references it throughout the body of the letter . . . . [I]t does not give rise to a separate agreement independent from the terms of J.R.'s Plan nor does it support Plaintiff's allegations that Aetna approved and promised to pay [any] amount." (*Id.* at 11-12.)  Indeed, "the letter expressly states that the authorization approvals . . . may not be paid pursuant to certain circumstances related to J.R.'s ERISA-governed plan." (*Id.* at 12.)

Based on its analysis of the call transcripts and the pre-authorization letter,[7] the Court concluded that Plaintiff's claims for reimbursement for surgical services "are based solely upon the terms of J.R.'s Plan governing payment for services provided by out-of-network providers. Plaintiff's request for payment was pursuant to the terms of J.R.'s Plan allowing for out-of-network benefits, rather than any independent representations or promises Defendants made."  (*Id.*) Accordingly, Plaintiff's common law claims were dismissed as expressly preempted by ERISA, and leave was given to file a further amended complaint. (*Id.* at 15-16.)

In the SAC, Plaintiff has not materially altered the factual allegations.  Instead, Plaintiff now asks the Court to ignore the pre-authorization letter for purposes of the ERISA preemption analysis and to focus on only the two April 26, 2021 pre-admission calls.  Plaintiff contends that "[w]hatever . . . language Aetna added to its May 7, 2021[] letter that contained . . . references to other 'terms' of the Plan[] is of no relevance to whether [there was] an independent an[d] enforceable promise to pay services at a rate and in a manner known to both parties." (ECF No. 31 at 14.)

---

[7]   The Court explained that it could look to the transcripts of the calls and the pre-authorization letter under the integral document exception. (*See* ECF No. 23 at 5-7.)

Having carefully reviewed the SAC and Plaintiff's new arguments, the Court finds that the

amendments do not cure the defects or change the conclusion that the common law claims are

expressly preempted.    The transcripts of the pre-admission calls clarify that Aetna's

representations about what J.R.'s ERISA-governed plan paid concerned the plan itself,[8] and Aetna

did not make oral promises to pay a certain amount for surgical services.  At the time of the calls,

J.R. had not presented to Dr. Lipani, and Aetna's representative gave reimbursement advice

primarily related to payment for the *initial medical office visit*.[9]  These factual circumstances are

readily distinguishable from what the Third Circuit confronted in *Plastic Surgery Center*.

In *Plastic Surgery Center*, the insurer had promised to pay for specific surgical services

not otherwise covered by the plan.  967 F.3d at 231 ("The claims here, on the other hand, arose

precisely because there was no coverage under the plans for services performed by an out-of-

network provider like the Center.").  The insurer and out-of-network provider had negotiated the

rate of reimbursement for those services over multiple telephone calls, and the insurer expressly

"agreed to approve and pay for" the services at the agreed-upon rates.  *Id.* at 224 ("In J.L.'s case,

'Aetna contracted with [the Center] to provide multi-stage breast reconstruction surgery to J.L.,

along with related medical services, and to pay [the Center] a reasonable amount for those services

---

[8]     (ECF No. 27-4 at 6-8 ("Princeton Neurological: I want to know if this member has out-of-network benefits.  If he does, I want to know the details of his out-of-network benefits for professional services. . . .   Aetna: He does have out-of-network coverage. . . .   Princeton Neurological: *This plan* is going to pay 100 percent of fair health rate, you're saying?  Aetna: Yes, ma'am." (emphasis added)).)

[9]     (ECF No. 27-4 at 6 ("Aetna: What type of professional services are you speaking of, ma'am?  Princeton Neurological: Well, initially, a special office visit and then perhaps spine surgery if he needs it.  I don't know.  We haven't seen him yet."); at 8 ("Aetna: Now the member will have a $10 per visit deductible for the office visit."); at 9 ("Aetna: It's 100 -- for the office visit it's 100 percent.  And the co-insurance limit would be that $2,000. . . .  [F]or the medical office visit, he's going to have to pay -- he's going to have to pay -- he's got to pay that $10 per visit deductible.  And then the balance is reimbursed at the 100 percent."); at 17 ("Aetna: For the medical office visit, it's 100 percent of reasonable and customary.").)

9

according to the terms of the Plan.'  This agreement was struck during telephone conversations between Aetna and Center employees. . . .  In D.W.'s case, . . . [t]he notes next reflect that an Aetna employee called the Center back to confirm that Aetna 'agreed to approve and pay for' D.W.'s surgery and to provide payment at the 'highest in[-]network level.'").

In contrast, it is undisputed that J.R.'s plan contained a rate of reimbursement for the out-of-network services provided by Princeton Neurological,[10] and during the April 26, 2021 calls, Princeton Neurological did not identify any specific surgical services to be provided.  Aetna therefore could not have promised in April 2021 to pay for services yet unknown.  And unlike the insureds in *Plastic Surgery Center*, here "the scope of coverage, as well as payment, would be limited to the terms of the plan[]—leaving open the possibility that some services would not be compensated at all."  967 F.3d at 231; *see also Advanced Orthopedics & Sports Med. Inst., P.C. v. Oxford Health Ins., Inc.*, Civ. No. 21-17221, 2022 WL 1718052, at *5 (D.N.J. May 27, 2022) ("[T]he determination of Plaintiff's eligibility for payment in the first instance, and the subsequent amount of any payment, rest not on the terms of an independent agreement, but on a plan-based obligation—*i.e.*, the plan's terms, conditions, exclusions, and limitations.  Accordingly, as alleged, the claims as pleaded are for benefits due under an employee benefit plan.").

Further, despite Princeton Neurological seeking to have the Court ignore the May 7, 2021 pre-authorization letter and the letter's express references to J.R.'s ERISA-governed plan, the SAC continues to cite Aetna's pre-authorization in its allegations.  (ECF No. 25 ¶ 31 ("PNS thus submitted the appropriate paperwork for Aetna to authorize the proposed surgery, and on May 7, 2021, Aetna approved Dr. Lipani's proposed treatment plan.").)  The Court could thus consider

---

[10]    (ECF No. 25 ¶ 31 ("[T]he pre-authorization letter merely confirmed that the procedures in question were . . . covered services under the terms and conditions of J.R.'s Local 313 Plan.").)

the letter for purposes of preemption,[11] and the Third Circuit has also suggested that in certain circumstances a "superseded pleading may be offered as evidence rebutting a subsequent contrary assertion." *W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 172-73 (3d Cir. 2013); *see also Schomburg v. Dow Jones & Co.*, 504 F. App'x 100, 104 (3d Cir. 2012) ("Under certain circumstances, an earlier pleading may be offered as evidence rebutting a contrary assertion in a later pleading.").

In any event, even if the Court ignores the pre-authorization letter and somehow finds that the common law claims are not expressly preempted, as Princeton Neurological urges, the April 26, 2021 pre-admission calls alone do not satisfy the elements of the common law claims.  The Court cannot infer from the vague pre-admission discussions between Aetna and Princeton Neurological that there was a meeting of the minds for a claim based on breach of contract (whether implied or express) or a derivative breach of the implied warranty of good faith claim; that any promise was "clear and definite" enough for promissory estoppel; or that any reliance by Princeton Neurological was justified or reasonable under the circumstances for a claim based on misrepresentation (whether intentional or negligent).  When the call took place, neither party expected a specific surgical service would be provided, and J.R. had not even been accepted or seen as a patient by Princeton Neurological.  As a result, Princeton Neurological could not possibly have known what procedures, if any, Dr. Lipani might ultimately propose to perform, nor could Aetna have known what it might eventually be asked to reimburse.  These facts do not plausibly plead the common law claims for allegedly underpaid surgical services.[12]  *See, e.g., Princeton*

---

[11]     At oral argument, counsel for Plaintiff acknowledged that the Court could consider the pre-authorization letter if it so desired.

[12]     Because the Court finds that the common law claims are expressly preempted by ERISA § 514(a), it does not rest its decision on the ground that the claims are not plausibly stated under Rule 12(b)(6).

*Neurological Surgery, P.C. v. Horizon Blue Cross Blue Shield of New Jersey*, 2024 WL 178220, at *7 (N.J. Super. Ct. App. Div. Jan. 17, 2024) (affirming dismissal on summary judgment of promissory estoppel and negligent misrepresentation claims because "PNS could not have reasonably relied on Horizon's representations as it had not seen the patients" and it "did not know . . . [the] diagnosis or the CPT codes it intended to bill"); *Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Ins. Co.*, Civ. No. 23-8521, 2023 WL 8534865, at *5-6 (S.D.N.Y. Dec. 11, 2023) (Rakoff, J.) (under New York law,[13] dismissing breach of contract and promissory estoppel claims because it was "plain from the transcript of the call that defendant's employee was merely recounting . . . scope of coverage and benefit rates" and "[n]o reasonable person would understand that representation to be an offer or promise to pay a particular amount to plaintiffs"); *Premier Orthopaedic Assocs. of S. NJ, LLC v. Aetna, Inc.*, Civ. No. 20-11641, 2021 WL 2651253, at *4 (D.N.J. June 28, 2021) ("These vague allegations as to which services Aetna agreed to cover, and how much Aetna agreed to pay Plaintiff for these services, do not provide sufficient facts to support the plausibility of Plaintiff's breach of contract, promissory estoppel, and accounts stated claims.").

Accordingly, Plaintiff's common law claims against Aetna are dismissed as expressly preempted by ERISA.  Because Plaintiff was previously granted leave to amend and any further amendment appears futile, this dismissal is with prejudice.

---

[13]     The laws of New Jersey and New York are similar for such claims.  *See, e.g.*, *Zurich Am. Ins. Co. v. Big Green Grp., LLC*, Civ. No. 19-11500, 2023 WL 1860569, at *3 (D.N.J. Feb. 9, 2023) (finding that New Jersey and New York "each require a plaintiff to allege the same four elements in order to state a claim for breach of contract"); *Varonis Sys., Inc. v. Sphere Tech. Sols., LLC*, Civ. No. 18-12055, 2019 WL 2119558, at *5 n.11 (D.N.J. May 14, 2019) (promissory estoppel claim "would yield the same result under either New York or New Jersey law").

## IV.   CONCLUSION

For the reasons set forth above, and other good cause shown, Aetna's Motion to Dismiss (ECF No. 27) Plaintiff's Second Amended Complaint (ECF No. 25) is **GRANTED**.   An appropriate Order follows.

Dated:  January 29, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

13